STATE OF NEW JERSEY, BY DAVID D. FURMAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JEFFERSON LAKE SULPHUR COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued November 21, 1961—Decided February 19, 1962.

*Mr. Charles J. Kehoe,* Deputy Attorney General, argued the cause for plaintiff-respondent (*Mr. David D. Furman,* Attorney General, attorney).

*Mr. Eberhard Deutsch,* of the Louisiana Bar, argued the cause for defendant-appellant (*Messrs. Stryker, Tams & Dill,* attorneys; *Mr. Arthur C. Dwyer,* and *Mr. Rene H. Himel, Jr.* (*Messrs. Deutsch, Kerrigan & Stiles*) of the Louisiana Bar, of counsel).

The opinion of the court was delivered by

FRANCIS, J. The Chancery Division of the Superior Court declared invalid an amendment to the charter of the defendant corporation which was designed to circumvent the Custodial Escheat Act, *L.* 1951, *c.* 304, *N. J. S.* 2A:37–29 *et seq.* The subsequent appeal from the decision was certified on our own motion before argument in the Appellate Division.

Jefferson Lake Oil Co. was incorporated in Louisiana in 1928. Later, its name was changed to Jefferson Lake

Sulphur Company, Inc. Defendant Jefferson Lake Sulphur Company was created in New Jersey on March 30, 1949. The Louisiana corporation was merged into the New Jersey company on December 30, 1949. Under the merger agreement Louisiana stockholders were entitled to exchange their shares for shares of the New Jersey product corporation. It provided also that all "debts, liabilities and duties" of both companies would survive the merger and become in all respects the obligations of the product corporation. That result would have followed in any event by operation of law. See *State v. Union Bag-Camp Paper Corp.*, 35 *N. J.* 390 (1961).

Prior to the merger, and more particularly between 1933 and 1949, the Louisiana corporation had declared dividends on its stock. On each declaration the funds for payment were transferred to a special dividend account in a New Orleans bank. Eventually the dividends unclaimed by stockholders were deposited in one account where they remained until called for by the stock owner. Louisiana had no escheat statute which applied to these dividends.

Subsequent to the merger and down to June 5, 1953 (five years prior to institution of this action), the resulting New Jersey corporation declared dividends on its outstanding stock. In each instance the same practice was followed with respect to deposit thereof in a separate account, the depositary being a New York bank.

On July 13, 1951 New Jersey enacted the Custodial Escheat law, *L.* 1951, *c.* 304, *N. J. S.* 2*A* :37–29 *et seq.* It provides that:

"* * * [T]he state may take into its protective custody property consisting of cash, dividends, interest or wages owed by any corporation organized and doing business under the laws of this state, belonging to any person remaining unknown, or whose whereabouts is unknown, or whose property remains unclaimed as defined herein for a period of 5 successive years; and after a period of protective custody has expired as herein prescribed, the state may proceed to escheat such property to itself." *N. J. S.* 2*A* :37–29.

The procedure established to obtain possession of the property is a summary action in the Superior Court brought by the Attorney General in the name of the State. And the court is authorized to direct a corporation such as defendant to deliver the property to the State Treasurer for safekeeping. *N. J. S.* 2A:37–30, 31. As a further aid to the effectiveness of the remedy, a specific duty was imposed upon the person having knowledge or information concerning escheatable property to notify the Attorney General within a reasonable time. *N. J. S.* 2A:37–42. Basically, the legislative purpose was to confer upon the State the right to possession of certain intangible personalty in ample time to avoid the application of the six-year statute of limitations (*N. J. S.* 2A:14–1, *N. J. S. A.*). *State v. Union Bag-Camp Paper Corp., supra,* at *p.* 393. As we said in *Union Bag,* reasonably prompt notice is contemplated. Failure to give the notice will bar reliance on the statute of limitations. *State by Parsons v. United States Steel Corp.,* 22 *N. J.* 341, 355–360 (1956). Thus, as a matter of public policy as projected by the Legislature, at the end of five years after the declaration of corporate dividends, the State acquires an accrued right to possession of those remaining unclaimed, a right partaking of the characteristics of an equitable lien. *State v. Union Bag-Camp Paper Corp., supra,* at *p.* 398.

About four months after the adoption of the Custodial Escheat statute, defendant engaged in a frankly admitted effort to circumvent its application. On December 5, 1951, the Board of Directors adopted a resolution recommending amendment of the certificate of incorporation by adding Article (n) as follows:

"As to every dividend on any stock of this company or any of its predecessors, which shall remain, or has remained, unpaid and unclaimed for a period of three years following the date on which it was payable, the funds set aside for payment of such unclaimed dividend shall be reclaimed by, and shall revert in full ownership to, this corporation, and the obligation of this corporation to pay such dividend shall thereupon cease; provided that the board of directors

may, at any time, for any reason satisfactory to it, but need not, authorize the officers of the company to pay to the entity theretofore entitled thereto the amount of any dividend, ownership of which will have reverted to the company under the provisions hereof."

No such provision was in the certificate of incorporation of the Louisiana company.

Further amendments, Articles (o) and (p), were recommended also. The purpose of Article (o) was to bring about a reversion of ownership to the defendant of any shares of its stock which, under the merger agreement, were to be issued in substitution for stock of the Louisiana corporation but which remained unclaimed by January 1, 1953. As of that date, such shares would be issued in the name of defendant. The aim of Article (p) was to bring about a transfer to defendant of title of any shares of defendant's stock which had been issued or were issuable as a stock dividend, or pursuant to a stock split up or any other plan of recapitalization or reorganization, whenever such shares remained unclaimed for three years. The Board of Directors was given the same discretion to issue to the original owner the stock so "escheated" to the corporation under Articles (o) and (p) as under Article (n). Although the principle involved is the same, the validity of (o) and (p) is not specifically involved in the present litigation.

As can be seen by the Article (n) amendment, defendant in effect undertakes to establish a private escheat law for itself and to interpose it between the corporate entity and the State. Moreover, the amendment sets up the Board of Directors as a private judicial tribunal and invests it with broad discretion, unlimited as to time, to decide whether, for any reason deemed sufficient by it, payment should be made subsequent to the expiration of the three-year period to a stockholder whose unclaimed dividends have been "escheated" to the corporation. This portion of the amendment apparently was designed to substitute for *N. J. S.* 2A:37–40 which authorizes the Superior Court at any time within seven years after the final judgment of escheat to

reopen the proceedings and for specified reasons to direct payment to a stockholder of previously unclaimed dividends.

■ To accomplish the purpose of amending the charter, the Board of Directors mailed to all stockholders of defendant and of the Louisiana corporation a notice of special meeting and a proxy statement explaining the matter. The explanation of Article (n) was that its object was "to provide that all dividends on the company's stock, unclaimed for three years after the date payable shall revert in full ownership to the company." That statment was not accurate. The proposed amendment not only related to defendant's dividends but to those of "any of its predecessors," *i. e.,* the Louisiana company, as well. Furthermore, the explanation said that the amendments ((n), (o) and (p)) were prompted by the New Jersey Escheat law, "under which all money payable to others by New Jersey corporations, unclaimed by the owner for five years, and all other property held for others by such corporations, unclaimed by the owner for fourteen years, becomes the property of the State of New Jersey." The inaccuracy of that information is patent. Under the act, custody of the unclaimed dividends, not title to them, is transferred to the State Treasurer at the order of the Superior Court after the five-year period. But title does not pass until at least two more years have elapsed without claim by the true owner in which event a judgment of escheat may be entered. And even upon the entry of an escheat judgment, at any time within seven additional years thereafter, the proceedings may be reopened and the stockholder's share, plus interest thereon, ordered released to him, if he did not have *actual knowledge* of the escheat action. In addition to the described lack of information, the statement failed to advise of the safeguards imposed on the State as to notice to stockholders of the custodial escheat action and of the later proceeding for judgment of escheat. Even assuming that the charter change under review was not *ultra vires,* in a situation where a corporation seeks to influence its stock-

holders to "escheat" their property to it rather than have it pass to the State, the fiduciary status which the corporation occupies with respect to the unclaimed dividends calls for full and fair disclosure of all the relevant facts upon which the stockholders' decision should be formulated. Obviously the obligation was not adequately discharged by the proxy statement and that reason alone is sufficient warrant for invalidating the amendment. But in our judgment disposition of the matter should not be based upon or limited to issues of procedural infirmity. The importance of the basic question of corporate authority to amend the charter in the fashion attempted here urgently requires decision on the merits. Accordingly, we return to the chronology of events in connection with the proposed amendment.

The record reveals that on December 12, 1951 the special meeting to consider the proposed charter addition was held. The amendment was approved by slightly more than two-thirds of the common and 52+% of the preferred stockholder votes of the New Jersey corporation. At that time there were outstanding 349,227 shares of common and 97,502 shares of preferred stock; 248,574 shares of common voted for and 1,520 shares voted against the addition; 99,133 shares did not vote. Of the outstanding 97,502 shares of preferred stock, 51,007 shares voted favorably and 1,355 unfavorably; 45,160 shares did not vote. At the date of the meeting, 355 shares of the preferred and 1,146 shares of common stock of the Louisiana corporation had not been exchanged for shares in the New Jersey corporation as provided by the merger agreement. The inference is inescapable that those unconverted shares did not vote for the amendment to the charter.

Following inclusion of the amendment in its charter, defendant transferred from the special dividend bank account to its earned surplus $5,234.97 in unclaimed dividends of the Louisiana corporation, and $422.49 in dividends on its own stock which had not been claimed for

three years. Whether any shares of stock of the Louisiana company which had not been exchanged for defendant's shares for more than three years (two years of which followed adoption of Article (o)) were appropriated and transferred to its ownership under the Article (o) amendment, does not appear. It may be noted here that notice of the stockholders' meeting to consider the proposed amendments was not given to the Attorney General, although the State then had an accrued right to custody under the 1951 Custodial Escheat Act of a substantial portion of the unclaimed dividends of the Louisiana corporation. Likewise, it is plain that no report of such dividends as had been unclaimed for five years prior to July 13, 1951, the effective date of the act, had been given to the Attorney General as required by *N. J. S.* 2A:37-42, *supra,* down to the date of these proceedings.

On June 6, 1958 the State instituted this action against defendant under the Custodial Escheat law to obtain possession of all dividends which had been unclaimed for at least five years. The Chancery Division entered judgment for $5,657.46, representing the total of the unclaimed dividends of the Louisiana and New Jersey corporations. On appeal therefrom, defendant argues that a corporate charter may validly limit the time within which a stockholder may claim dividends declared and set aside for him, and may validly provide for the reclaiming of them by the corporation and the reversion of ownership to it. We cannot agree.

█ When a corporation declares a dividend and specifically sets apart a fund in a separate bank account for purposes of its payment, the fund becomes the property of the stockholders distributively. *Martindell v. Fiduciary Counsel, Inc.,* 133 *N. J. Eq.* 408, 414 (*E. & A.* 1942). Because of continued possession of it, however, the corporation takes on the cloak of a trustee for the stockholders with respect to payment thereof to them. Such moneys once so separated from the general assets of the entity are trust funds for the payment of the dividend and cannot

be diverted by it for any other purpose. *State by Parsons v. Standard Oil Co.,* 5 *N. J.* 281, 300–303 (1950); 13 *Am. Jur., Corporations,* § 673. The nature of the trust is such that the term "stakeholder" has been applied to describe it. The obligation of the corporation is ministerial, *i. e.,* to turn over or to deliver to each stockholder his proportionate share of the fund upon proper request by him. Except for the naked right to custody, it has no legal or moral claim to the fund. *State by Richman v. Sperry & Hutchinson Co.,* 23 *N. J.* 38, 44 (1956); *State by Van Riper v. American Sugar Refining Co.,* 20 *N. J.* 286, 297 (1956).

The State in its quest for legitimate revenue has exercised its sovereign power as ultimate heir to abandoned or unclaimed personal property by assuming protective custody thereof when no claim for possession has been made by the true owner within five years. And it has ordained that ownership shall pass to it after the passage of two more years without request for payment by the owner, subject to the qualification that thereafter an owner who did not have actual knowledge of the escheat proceedings may recapture his property at any time within an additional seven years. *N. J. S.* 2A:37–30, 34, 39, 40. The statute represents the public policy of the State and it manifests the legislative will that such unclaimed moneys be used for the good of all of our citizens. Support for the enactment is found in the police power, the exercise of which in this area does not offend constitutional provisions with respect to due process and protection of property or contract rights. *State by Parsons v. Standard Oil Co.,* 5 *N. J.* 281, *supra,* affirmed *sub nom. Standard Oil Co. v. State of New Jersey,* 341 *U. S.* 428, 71 *S. Ct.* 822, 95 *L. Ed.* 1078 (1951); *A. P. Smith Mfg. Co. v. Barlow,* 13 *N. J.* 145, 158–160 (1953).

Defendant came to New Jersey and incorporated here, taking advantage of our liberal corporation law, *R. S.* 14:1–1 *et seq.* The act provides that the certificate of incorporation may contain

"* * * any provision, *consistent with law*, which the incorporators may choose to insert, for the management of the business and the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, its directors and stockholders or any class of stockholders." (Emphasis ours) *N. J. S. A.* 14:2–3.

Defendant's charter, which was prepared by the incorporators, authorized it

"(1) to mine for, and to process, sulphur, gas, oil, and other petroleum products and minerals; and to acquire, lease, construct and operate mining and drilling equipment and wells, machinery, tanks, pipe lines, refineries, transportation facilities and any and all other works, and real and personal property, used in connection therewith.

(2) Generally, to engage in any activities, businesses, occupations or enterprises permitted by law to corporations; and to do each and every thing suitable or incidental to the accomplishment of any one or more of the objects herein enumerated, or which shall at any time appear conducive to, or expedient for, the protection or benefit of the corporation."

 A charter granted under the General Corporation Act includes, as if written therein, the provisions of the statute under which it was issued and all applicable general laws. In the event of any conflict between them, the charter must yield. Also, within the limits of Federal and State Constitutions, any conflict subsequently arising because of legislation adopted pursuant to the State's reserved power or control over corporate activity must be resolved in the same fashion. The later expression of the legislative will is deemed a legitimate curtailment of the authority conferred by the certificate of incorporation. The new statute operates in effect as an amendment of the charter. *In re Collins-Doan Co.,* 3 *N. J.* 382, 390 (1949); *A. P. Smith Mfg. Co. v. Barlow, supra; State by Van Riper v. American Sugar Refining Co., supra,* at *pp.* 295, 296; *Faunce v. Boost Co.,* 15 *N. J. Super.* 534 (*Ch. Div.* 1951). Moreover, the state of the law is not only a continuing constituent part of the contract between the sovereign and the corporation, but stockholders purchase their stock subject to it,

590

and it becomes an integral part of their contract with the corporation and with each other. *State by Van Riper v. American Sugar Refining Co., supra,* at *p.* 296; *In re Collins-Doan Co., supra,* at *pp.* 390, 391; *General Invest. Co. v. American Hide & Leather Co.,* 97 *N. J. Eq.* 214, 224 (*Ch.* 1925), affirmed 98 *N. J. Eq.* 326, 330 (*E. & A.* 1925); *Warren v. 536 Broad Street Corp.,* 4 *N. J. Super.* 584, 592, 593 (*Ch.* 1949), affirmed 6 *N. J. Super.* 170 (*App. Div.* 1950).

The powers of the corporation cannot be enlarged by including provisions ostensibly bestowing them in the certificate of incorporation, if such powers are obnoxious to any applicable general law or to public policy. *Costello v. Thomas Cusack Co.,* 96 *N. J. Eq.* 83 (*Ch.* 1922), affirmed 94 *N. J. Eq.* 423 (*E. & A.* 1923); *Terwilliger v. Graceland Memorial Park Ass'n,* 35 *N. J.* 259 (1961); *Oregon Railway & Navigation Co. v. Oregonian Railway Co.,* 130 *U. S.* 1, 9 *S. Ct.* 409, 32 *L. Ed.* 837 (1888); *Bullard v. National Eagle Bank,* 18 *Wall* 589, 85 *U. S.* 589, 21 *L. Ed.* 923 (1873); *National Ass'n of C. P. Accountants v. United States,* 53 *App. D. C.* 391, 292 *F.* 668 (*Ct. App. D. C.* 1923); *Hartnett v. Plumbers' Supply Ass'n,* 169 *Mass.* 229, 47 *N. E.* 1002, 38 *L. R. A.* 194 (*Sup. Jud. Ct.* 1897). Nor can they be expanded in such case by amendment of the charter or by adoption of bylaws with the assent of the stockholders. *National Trust Co. v. Miller,* 33 *N. J. Eq.* 155, 162 (*Ch.* 1880); *Benintendi v. Kenton Hotel,* 294 *N. Y.* 112, 60 *N. E.* 2d 829, 159 *A. L. R.* 280 (*Ct. App.* 1945); 13 *Am. Jur., Corporations,* §§ 152, 156.

The will of the sovereign State is that dividends unclaimed for five years shall be amenable to its statutorily declared right of custodial escheat. Defendant corporation owes its existence to the same sovereign and subjection to the policy of acquiring and using such dividends for the common good must be deemed the price of incorporation. Thus, even though the Escheat Acts did not take the form of express amendments to the General Corporation Act,

they became part of the laws of our State and binding on defendant company and its shareholders in their relations with the company. *State by Van Riper v. American Sugar Refining Co., supra,* at *p.* 296. And so, as a result of the merger, ownership of the stock of the Louisiana corporation and dividends thereon, and ownership of the stock of the New Jersey corporation and dividends thereon, became subject to the paramount public policy with respect to escheat.

It is true, as suggested by defendant, that the Corporation Act confers broad power of amendment of its charter. *R. S.* 14:11–1. But that authority cannot rise higher than its source, and any amendment to achieve legal life must serve a legitimate corporate purpose as measured by the enabling legislation and general laws exhibiting the controlling public policy of the State. Alteration of a charter for the avowed purpose of defeating a relevant aspect of the sovereign's declared public policy cannot achieve judicial approval. Such a bootstrap operation signifies only the appearance of power, not the substance. Power in such an area can only be delegated by the Legislature; it cannot be assumed by the corporation nor can the courts confer it. The only safe rule is that a corporate entity may do no act except in subordination of the laws of the State. Whenever a rule is sought to be established by charter or amendment thereof or bylaw, which interferes with or endangers the efficacy of a declared public policy, authority therefor emanating from the creating power must be shown to legalize it. *Cf. Taylor v. Griswold,* 14 *N. J. L.* 222, 235 (*Sup. Ct.* 1834).

Escheat of unclaimed dividends serves the important public need of providing revenue to be utilized for the common good. This was recognized at common law as well as by the statute. Support for a corporate measure to bring about such a marked interference with that declared legislative purpose as defendant proposes here must be found in a clear expression of statutory authority. 6 *Fletcher, Cyclo-*

*pedia Corporations*, § 2491; 7 *id.* § 3652. Additional emphasis may be placed on the requirement for that authority in cases like this where the charter amendment in question not only runs counter to the Escheat Act but also to the course and spirit of the common law with respect to escheat, and to the spirit of the statutes of wills and intestate devolution of personalty.

The issue presented by this appeal is one of novel impression. No case in point has been discovered or cited specifically dealing with it. Defendant places reliance on *Armant v. New Orleans & C. R. Co.,* 41 *La. Ann.* 1020, 7 *So.* 35 (*Sup. Ct.* 1889), and *In re The Sydney Permanent Freehold Land & Building Company Limited,* 51 *Weekly Notes* 146 (Australia, *Ch.* 1934). Neither case is in point. In the former, although the charter contained a clause similar to the one under study here, no escheat statute was either involved or considered; in the latter, a statute expressly authorized the company to forfeit all dividends not claimed for three years.

There are to be found in the reports, however, cases dealing generally with efforts by corporations to engage in business practices, or to include provisions in their charters or bylaws, which are repugnant to the Corporation Act or general laws or public policy. By analogy they brand this defendant's charter amendment as *ultra vires.*

In *Oregon Railway & Navigation Co. v. Oregonian Railway Co., supra,* one railroad company leased to another company for a long term its road and appurtenances, franchise and right to exercise its powers. No authority appeared in the statutes relating to corporations which expressly or impliedly authorized such a lease by one or the acceptance of it by the other. Answering the argument that the corporate action found support by implication in the broad language of the charter, and striking down the lease, the United States Supreme Court declared that in determining the extent of a grant of power by the state all doubtful points of construction must be resolved against the grantee

and in favor of the government or the public. Moreover, it pointed out that the manner in which the granted powers are to be exercised "and their subjection to the restraint of the general laws of the state, and its principles of public policy" cannot be enlarged in any sense by inserting in the certificate of incorporation the authority to depart therefrom.

In *Bullard v. National Eagle Bank, supra,* the articles of association contained a provision regulating the transfer of stock in cases where the stockholder was indebted to the corporation. A bylaw was adopted in aid of the charter to the effect that no transfer could be made until the debt was satisfied, unless the Board of Directors ordered otherwise. The statute under which the incorporation was accomplished conferred general power to provide for the regulation of the bank's business and the conduct of its affairs, and authorized the promulgation of bylaws, "not inconsistent with the provisions of this Act," defining and regulating "the manner in which its stock shall be transferred." It appeared that the statute under which the bank was formed was a substitute for an earlier enactment which expressly ordained that no stockholder should have the right to transfer or sell his stock so long as he was liable as principal debtor or surety or otherwise to the corporation for any debt which had become due and remained unpaid. That section was left out of the substituted act, apparently because Congress considered it to be inconsistent with the new Currency Act, the policy of which was to permit no liens in favor of a bank upon shares of its stock in the hands of its debtors. The bank argued that although the law under which it was incorporated did not itself create a lien on a debtor's stock, as did the earlier act, it did by its words, which permitted regulation of the manner of transfer of stock, authorize the creation of a limitation on transfer by the charter and bylaws made under it. In rejecting the contention, the Supreme Court held that such an implication was inadmissible because it contradicted the spirit of

the law. And it said that a bylaw giving the bank a lien upon the stock against indebted stockholders ought not to be considered as a regulation of its business or a regulation for the conduct of its affairs.

In *National Ass'n of C. P. Accountants v. United States,* *supra,* the Association had been incorporated under a section of the Code of the District of Columbia which authorized citizens to organize for educational purposes. The particular section made no mention of a power to confer degrees. The certificate of incorporation provided, however, that the corporation "shall have the power to admit its members to the degree of certified public accountant" upon satisfactory proof of knowledge and after passing a prescribed examination. The Court of Appeals held the charter provision invalid. It said that a corporation can have no powers except those expressly conferred on it, and such incidental powers as may be reasonably necessary to carry into effect those expressly granted. No express authorization to grant degrees appearing in the statute and the authority not being reasonably necessary to execute the powers conferred, because the Association could do all the statute contemplated without admitting to degrees, the power to do so could not be deemed to exist. The court said also that the corporation could not assume powers to itself by the mere declaration in the charter that it had them.

Other examples of charter provisions or bylaws which have been condemned as offensive to public policy or contrary to express or implied provisions of legislative enactments, are to be found. A bylaw is opposed to public policy when it provides that a stockholder may not sell goods to a competitor unless he pays to his own corporation a fixed sum per item sold, and that avoidance of the requirement makes him liable to the forfeiture of his stock, *Burns v. Wray Farmers' Grain Co.,* 65 *Colo.* 425, 176 *Pac.* 487 (*Sup. Ct.* 1918). A bylaw which prescribes that no action should be taken except by unanimous vote of all of the directors, was held to flout the plain purpose of the legislature in

authorizing action by quorums. In this situation also the court rejected a contention that, even if invalid as between corporation and stockholder, the bylaw should be deemed valid as a contract between the stockholders *inter sese*. In doing so it said that the state has an interest in seeing that such private laws or bylaws as the corporation adopts are not inconsistent with public law. *Benintendi v. Kenton Hotel, supra;* and see Note, 15 *Wyo. L. J.* 207 (1961). A clause in a charter forfeiting the shares (on payment to him of full value) of any stockholder who commenced or supported any suit against the company or its directors, was adjudged unlawful. *Hope v. International Financial Society,* 4 *L. R. (Ch. Div.* 1876–77) 327. A provision in a certificate of incorporation that the company's profits may be reinvested in real estate does not enlarge its powers nor permit it to hold distributable profits indefinitely nor for remote or indefinite prospects of reinvestment. *Leviton v. North Jersey Holding Co.,* 106 *N. J. Eq.* 517, 521 *(Ch.* 1930).

In *Jackson v. Hooper,* 76 *N. J. Eq.* 592 *(E. & A.* 1910), two individuals, having acquired all the stock of a corporation, agreed to act as partners in equal control and management of the company which would then continue as a corporation in form only. The agreement was declared illegal as obnoxious to public policy and to the authority of the Legislature with respect to the establishment and operation of corporations. See also, *Prindiville v. Johnson & Higgins,* 92 *N. J. Eq.* 515, 520 *(Ch.* 1921), affirmed 93 *N. J. Eq.* 425 *(E. & A.* 1921).

These cases are, of course, not dispositive of the present problem. They do establish, however, that a certificate of incorporation is the measure of corporate capacity, and in the event a power assumed therein conflicts with a general law enacted by the Legislature for the common weal, the power must yield.

A certificate of incorporation, as prepared by the incorporators and filed under the General Corporation Act, stands in the place of a legislative charter. To the extent

that it, or an amendment thereof, is framed in accordance with all applicable law and public policy, it is a substitute for legislation. But it cannot be a substitute for a general statute with which it conflicts or which it was plainly intended to circumvent. In such case, particularly where the actual or inevitable conflict, as in the case of the Custodial Escheat Act, is with a legislative pronouncement representing the broad public policy of the State, the private legislation must yield.

Subversion of the Escheat Act is not a legitimate business purpose of defendant corporation. If the questioned charter amendments were adjudged valid, undoubtedly the Legislature would shorten the period for acquisition of the right of custodial escheat by the State to less than the three years prescribed by defendant for reversion of the unclaimed dividends or stock to it. The unseemliness of such a race must be apparent, and probably would be followed or anticipated by an amendment of the General Corporation Act or the Custodial Escheat Act banning charter provisions or bylaws designed to defeat escheat. But we do not have to contend with any such legislative action at this time.

In our judgment, the attempted interposition of defendant's private escheat law is clearly opposed to the spirit and essence of the public custodial escheat law and to the broad public policy represented thereby. In such a conflict the private law cannot survive. Accordingly, the amendment to its charter is adjudged invalid, and the judgment below is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.